1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   Perla Gonzales, et al.,                      No. CV-21-00139-TUC-DCB

10                    Plaintiffs,                 **ORDER**

11   v.

12   Borderland    Construction    Company
     Incorporated,

13
                          Defendant.
14

15          Pending before the Court is Defendant Borderland Construction Company's Motion

16   for Summary Judgment and Statement of Facts. (Docs. 42, 43.) Plaintiffs Perla and Luis

17   Gonzalez filed a responsive brief and a response to Defendant's statement of facts (Docs.

18   44, 45); and Defendant replied (Doc. 46). The reference was withdrawn from the

19   Magistrate Judge. The Court denies the Defendant's request for summary judgment.[1]

20                               **BACKGROUND**

21          Plaintiffs filed a Complaint on March 31, 2021, and an Amended Complaint on

22   September 23, 2021, alleging Borderland failed to pay their former employee, Perla

23   Gonzales (Gonzales), for overtime hours. (Docs. 1, 26.) Gonzales alleged she worked

24   approximately eight hours of uncompensated overtime per week, in the office as well as

25   on her personal cell phone after leaving the office. (Doc. 26 ¶¶ 32-35.) Gonzales alleges

26

27

28   _____
     [1] Defendant requested oral argument pursuant to LRCiv. 7.2(f). The Court declines to hold
     argument, finding it will not further the Court's resolution of the motion.

1  Borderland's actions violated the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. (Doc.
2  26.) After the close of discovery, Borderland filed a motion for summary judgment.

3  **SUMMARY JUDGMENT STANDARD**

4  In deciding a motion for summary judgment, the Court views the evidence and all
5  reasonable inferences therefrom in the light most favorable to the party opposing the
6  motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Ins.*
7  *Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987). Summary judgment is appropriate if
8  the pleadings and supporting documents "show that there is no genuine issue as to any
9  material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.
10 Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party need
11 not produce evidence of a genuine issue of material fact but may satisfy its burden by
12 "pointing out . . . that there is an absence of evidence to support the nonmoving party's
13 case." *Celotex Corp.*, 477 U.S. at 325. Material facts are those "that might affect the
14 outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A genuine issue
15 exists if "the evidence is such that a reasonable jury could return a verdict for the
16 nonmoving party." *Id.*

17 **FACTS**

18 The Court sets forth the relevant facts presented by Plaintiffs and Defendant, to the
19 extent properly supported by citations to the record.[2] The parties' briefs included
20 substantially more facts that the Court finds necessary to resolve the motion.

21 Gonzales was a dispatcher for Borderland during the relevant time period, a position
22 she began in September 2018. (Doc. 43, Ex. 1 ¶¶ 10, 18; Ex. 3 ¶ 4; Doc. 44-1 at 14.)

23 _____
[2] Plaintiffs' controverting statement of facts did not comply with the Local Rules. In
24 responding to Defendant's Statement of Facts, Plaintiffs were required to state whether they
   disputed Defendant's statement in each paragraph and cite record evidence to support any
25 <u>dispute</u>. LRCiv 56.1(b)(1). In contravention of this rule, after Plaintiffs denied <u>or admitted</u>
   one of Defendant's statements, they included a response in narrative form. To the extent
26 Plaintiffs wanted to rely upon additional facts, they should have articulated them in
   separately numbered paragraphs with citation to admissible record evidence. LRCiv
27 56.1(b)(2). Plaintiffs failed to set forth any additional facts in separate paragraphs. They
   relied solely upon their repetitive narrative responses. Additionally, a number of Plaintiffs'
28 citations did not support the stated facts. The Court has done its best to consider the facts
   upon which Plaintiffs rely, to the extent supported by their record citations; however, it is
   more challenging due to the violations of the Local Rules.

1  Borderland scheduled its dispatcher, which was an hourly position, to work only 40 hours

2  per week. (Doc. 43, Ex. 1 ¶ 9; Ex. 3 ¶ 9.) With respect to her prior work as a receptionist

3  for Borderland, Gonzalez testified that she was told the position was salaried so, if she was

4  late or took time off, she would need to make up time within the same week to receive a

5  full paycheck. (Doc. 43, Ex. 1 ¶ 13; Doc. 44-1 at 11.) Gonzalez testified that if she worked

6  less than 40 hours in a week, Borderland directed her to report the differential to Borderland

7  Executive Administrative Assistant Christina (Diaz) Coleman, and her pay for that time

8  would be deducted from her paycheck. (Doc. 44-1 at 24-25, 89; Doc. 43, Ex. 2 ¶ 13; Ex. 7

9  ¶¶ 5, 7.) She stated that system did not change for the entirety of her time with Borderland.

10 (Doc. 44-1 at 11.) As a receptionist, she was told Borderland did not pay overtime and she

11 could not report extra hours; she never asked the overtime policy for the dispatcher

12 position. (*Id.* at 25.) As a dispatcher, Gonzalez also understood herself to be "salaried" for

13 40 hours a week. (*Id.* at 70.) Gonzalez did not report if she worked more than 40 hours

14 because she did not know she was supposed to do so, and she did not want to jeopardize

15 her job. (*Id.* at 24-25, 75.) Coleman stated that it was "extremely rare" for an employee to

16 obtain permission to work overtime, but any overtime hours should be reported to

17 Coleman. (Doc. 43, Ex. 7 ¶ 8.) C.J. Prettyman, Borderland's CFO, averred that Borderland

18 paid its dispatcher for 40 hours a week for all weeks worked, even if the employee worked

19 less than 40 hours in a week. (*Id.*, Ex. 1 ¶ 10.) Gonzalez was paid a full weekly salary other

20 than during her first and last week of employment and during her maternity leave. (Doc.

21 43, Ex. 1 ¶¶ 40, 41; Ex. 8.)

22     Borderland directed Gonzales to work a set schedule. (Doc. 43, Ex. 2 ¶ 13; Ex. 3

23 ¶ 8; Doc. 44-1 at 11.) Gonzales began her workday at 5 a.m. or 6 a.m. (depending on the

24 season), took a one-hour lunch, and completed work at the end of 9 hours. (Doc. 44-1 at

25 21, 39, 54.) During her lunch break, Gonzales was relieved of her job responsibilities by

26 Sally Salica, Senior Administrative Assistant at Borderland. (*Id.* at 22; Doc. 43, Ex. 2 ¶ 9.)

27 Clint Elder, Borderland's Vice President, averred that Borderland had a clear expectation

28 that its hourly employees (which is how Gonzales was classified) would not work more

than 40 hours per week. (Doc. 43, Ex. 3 ¶¶ 9, 22.) According to Elder, Prettyman, and Salica, Gonzalez had been instructed not to work outside her scheduled hours and not to work more than 40 hours a week. (*Id.*, Ex. 1 ¶ 31; Ex. 2 ¶¶ 13, 26; Ex. 3 ¶¶ 26, 34.) In response to Gonzalez mentioning that she needed to handle some scheduling matters for work while she was on paid time off status, Elder recalled telling Gonzalez, twice, that she should not work "after hours." (Doc. 43, Ex. 3 ¶ 33.)

Elder averred that the dispatcher was expected to perform all job functions from the office, with the exception of obtaining a permit. (*Id.* ¶ 12.) Gonzalez requested to work from home twice; Borderland denied her requests and informed her that she was not allowed to work from home. (Doc. 43, Ex. 1 ¶ 21; Ex. 3 ¶ 20; Ex. 12 at 7.) Regardless, when Borderland "supervisors or men in the field" would call Gonzalez after work hours for things they needed, she would handle the request from home. (Doc. 44-1 at 32, 66.) She did so for the convenience of the "guys outside." (Doc. 43, Ex. 12 at 6.) She testified that she did not inform the callers that she was at home. (Doc. 44-1 at 36.)

At an unspecified time, Prettyman learned that Gonzales was communicating with trucking companies while at home on leave. (Doc. 43, Ex. 1 ¶ 32.) Gonzales asserted that the time should not be deducted from her leave bank because she was working. (*Id.*) Prettyman averred that he had Borderland compensate Gonzales for the work hours, and he directed her to work only from the office. (*Id.*) Prettyman reiterated that, on the few occasions he learned Gonzales was working outside her standard work hours, he directed Borderland to compensate her and told Gonzales not to do that again.[3] (*Id.* ¶ 29.) Gonzalez never informed Prettyman that she had worked overtime hours for which she was not paid. (*Id.* ¶¶ 27-28.) Other than the specific occasions identified by Prettyman, he, Salica, and Elder attest they had no knowledge that Gonzalez worked outside the office or beyond her standard working hours. (Doc. 43, Ex. 1 ¶ 29; Ex. 2 ¶¶ 21, 31; Ex. 3 ¶¶ 31-34.)

---

[3] Prettyman did not elaborate on the form of this compensation. No overtime hours or pay are reflected on Gonzalez's payroll records. (Doc. 43, Ex. 8.) However, Prettyman may have credited Gonzalez with paid-time-off hours.

1    In October 2018, Gonzalez signed Borderland's policy that personal cell phones
2    were not to be used during work hours.[4] (Doc. 43, Ex. 16.) Gonzalez asked for a company-
3    issued cell phone, but that request was denied. (Doc. 44-1 at 49-50.) Elder averred that, in
4    denying her request for a cell phone, he explained to Gonzalez that she was not to work
5    outside the office or her scheduled hours. (Doc. 43, Ex. 3 ¶ 19.) Gonzalez provided her
6    personal cell phone number to trucking companies for their use while she was in or out of
7    the office, but she did not recall who told her to do that. (Doc. 44-1 at 29.) Gonzalez
8    testified that Salica, Elder, and the receptionist would have seen her doing work on her
9    personal cell phone while in her office. (*Id.* at 33.) Although Salica and Elder knew
10   Gonzalez used her personal cell phone during the workday, they believed it was in relation
11   to personal matters. (Doc. 43, Ex. 2 ¶ 15; Ex. 3 ¶¶ 15-16.)

12   Gonzalez regularly received calls from Borderland employees, project managers or
13   supervisors in the field, or its customers, when she was at an appointment or already had
14   left work for the day. (Doc. 44-1 at 26-27, 32, 36, 43, 66-68; Doc. 43, Ex. 12 at 6.) Gonzalez
15   did not remember if she ever discussed, with anyone at Borderland, the frequency of those
16   calls. (Doc. 44-1 at 32-33, 36-37, 48, 70, 90-91; Doc. 43, Ex. 3 ¶¶ 18, 22, 30.) However,
17   she testified that Elder, Salica, and the receptionist knew she received calls after hours
18   because she would call the office from home to confirm things with them. (Doc. 44-1 at
19   33.) And she would tell Elder about work she had handled, and he would have known that
20   occurred outside working hours because she already had left the office (although she
21   sometimes left early). (*Id.* at 29.) She recalled telling Salica and Elder, in an email, that she
22   took phone calls while out at an appointment. (*Id.* at 44; Doc. 43, Ex. 12 at 5.) Salica told
23   her that she could have had the caller contact Salica, but Gonzalez said she didn't mind
24   taking the calls. (Doc. 44-1 at 44-45; Doc. 43, Ex. 12 at 5-6.) And, in 2019, Gonzales

---

25   [4] Borderland's cell phone policy, which focuses on safety for employees working on a
26   building site, provides, in relevant part:
         Personal cell phones are not permitted for use during working hours . . . . The
27       use of these items while at work could cause a person to become distracted
         and distractions in the construction industry can lead to accidents and
28       injuries. When you are working, you need to be focused on the task at hand,
         not talking on your cell phone.
     (Doc 43, Ex. 16.)

- 5 -

informed Salica that she received calls and text messages up until 4 p.m., but she did not clarify that she was responding to those messages outside her scheduled work hours. (Doc. 43, Ex. 2 ¶ 21.)

Gonzalez testified that Salica was "constantly" telling her that she needed to make up time. (Doc. 44-1 at 73.) Gonzalez informed Salica that she was making up the time she took off for appointments, but she did not notify her that she was working more than 40 hours in a week. (*Id.* at 74, 76 ; Doc. 43, Ex. 9.) Gonzales did not tell either Salica or Elder if she worked through lunch or stayed late to make-up time for appointments. (Doc. 43, Ex. 2 ¶ 19; Ex. 3 ¶ 24; Doc. 44-1 at 22.) Sometimes Gonzalez did not take a lunch, but she does not remember how many times that happened; she estimated once a week. (Doc. 44-1 at 22, 91.) "[M]ost always" she left her desk for lunch but, if she did not, she did not report it because she could be seen through her office window. (*Id.* at 21-22.) Gonzalez thought that she may have twice told Elder or Salica that she worked through lunch because she had so much work, but it was possible she told them on a day she was making up hours. (*Id.* at 92-93.) Because neither Elder or Salica took any action in response to her working through lunch (e.g., reassigning work or compensating her financially), she did not continue to report it. (*Id.*) Gonzalez stated that, when project managers asked her to complete a last-minute, same-day project, she always agreed to do so and stayed late if necessary. (Doc. 43, Ex. 12 at 8.) Gonzalez testified that the latest she stayed at the office was 5 p.m., when the office closed. (Doc. 44-1 at 93.) Elder declared that he did not see Gonzalez in her office after her scheduled working hours. (Doc. 43, Ex. 3 ¶¶ 25, 36.) Coleman does not recall Gonzalez ever working in the office until 5 p.m., the end of Coleman's scheduled workday. (*Id.*, Ex. 7 ¶¶ 15-16.)

In March 2020, after leaving work early, Gonzales texted Salica and Elder about a job scheduled for the following day for which she had been receiving phone calls while out of the office. (Doc. 43, Ex. 2 ¶ 30; Ex. 3 ¶ 35; Ex. 10.) Salica and Elder averred that those texts were the way in which they first learned that Gonzales was receiving phone calls related to work when she was not at the office. (Doc. 43, Ex. 2 ¶ 30; Ex. 3 ¶ 35.) Salica and

Elder, separately, informed Gonzales that she was not to conduct work outside the office or her scheduled work hours. (Doc. 43, Ex. 2 ¶ 30; Ex. 3 ¶¶ 18, 35.) Elder also reminded Gonzales that she was not to work more than 40 hours in a week. (Doc. 43, Ex. 3 ¶ 35.) These texts also led Salica to speak with Gonzales about whether she had been working more than 40 hours per week without reporting the time; Salica understood that Gonzales had not been working extra hours. (*Id.*, Ex. 2 ¶ 31.)

Gonzales resigned from Borderland in April 2020. (*Id.*, Ex. 1 ¶ 25.) The only complaint Gonzalez ever had registered with Borderland, regarding her compensation, was about her hourly rate of pay. (Doc. 44-1 at 60-62.) She testified that she always worked 40 hours or more in the office, but then stated she couldn't remember if she worked 40 hours every week plus working outside the office. (*Id.* at 85.) Gonzalez's email records reflect that she sent very few emails after her scheduled working hours. (Doc. 43, Ex. 13 ¶ 7; Ex. 15.) During a September 2020 interview with the Arizona Civil Rights Division, Gonzalez stated that she never worked 40 hours, "for the most part [she] always did like 45-ish hours." (Doc. 43, Ex. 12 at 8.) Gonzalez estimated, during her deposition, that she worked about eight hours per week beyond the 40 hours she was scheduled to work. (Doc. 44-1 at 84.) Her calculation was based on spending at least one hour a day taking calls, text messages, and orders, during her lunch hour or after hours. (*Id.* at 84, 90-91.) She did not remember if she reviewed her phone records or text messages in reaching those estimates. (*Id.* at 84.) Gonzalez estimated that she received five or more after-hours calls per week on her personal cell phone from Borderland supervisors and project managers; it took 10 to 30 minutes to respond to each call. (*Id.* at 27, 32, 65-68.) She never reported this overtime. (*Id.* at 52.)

## DISCUSSION

Plaintiffs allege an overtime violation of the FLSA, which provides that employers must pay their employees one-and-a-half times their regular rate of pay for hours worked beyond 40 hours in a week. 29 U.S.C. § 207. An overtime violation of the FLSA has three elements: "(1) she was an employee of Defendant[], (2) she was covered under the FLSA,

and (3) Defendant[] failed to pay her . . . overtime wages." *Smith v. Nov. Bar N Grill LLC*, 441 F. Supp. 3d 830, 834 (D. Ariz. 2020) (citing 29 U.S.C. § 207(a)); *see also Quinonez v. Reliable Auto Glass, LLC*, No. CV-12-000452-PHX-GMS, 2012 WL 2848426, at *2 (D. Ariz. July 11, 2012). Borderland argues that Gonzalez is unable to establish a right to relief under the FLSA based on the third element, because she did not work overtime for which Borderland failed to pay her.

The FLSA provides that employers "shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." 29 U.S.C. § 211(c). Borderland argues that it maintained adequate records that comply with the FSLA. Regardless of whether Borderland's system was generally sufficient, its records do not document any overtime hours worked by Gonzalez; she was paid for exactly 40 hours every full week of her employment as a dispatcher. (Doc. 43, Ex. 8.) Therefore, Gonzalez is not able to rely on Borderland's payroll records to meet her burden of proving that she worked overtime and the number of hours, if any, for which she is due compensation. In that circumstance, the Supreme Court has directed "that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), *superseded on other grounds by statute as noted in, Carter v. Panama Canal Co.*, 463 F.2d 1289 (D.C. Cir. 1972).

**Did Plaintiff Work Overtime Hours?**

The Court first must evaluate whether Borderland's evidence establishes that Gonzalez did not work uncompensated overtime. *See Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir. 1986) (citing *Mt. Clemens Pottery*, 328 U.S. at 688). Gonzalez testified that she worked more than forty hours a week on a regular basis. According to Gonzalez, she sometimes worked through lunch or stayed at the office past her scheduled work hours because she had additional work to do. She also received five or more work calls per week

on her cell phone, during lunch or appointments, or after she had left the office. She spent 10 to 30 minutes working in response to each call. Based on the declarations of several Borderland employees, there is a factual question whether some, or all, of this time was attributable to Gonzalez "making up" regular hours that she had not worked in a given week. Some of Gonzalez's colleagues at Borderland attested they did not see Gonzalez in the office during the hours she asserts she was performing overtime work. And Borderland executives declared that they did not have knowledge of Gonzalez working any overtime hours for which she was not compensated.

Viewing the evidence in Gonzalez's favor, there is a genuine issue of fact regarding whether she worked overtime hours while employed by Borderland. None of the evidence provided by Borderland's employees directly or wholly refutes Gonzalez's testimony that she worked overtime hours on a regular basis. Rather, Borderland's evidence merely raises questions about Gonzalez's veracity, which is not a matter for resolution on a motion for summary judgment. *See Anderson*, 477 U.S. at 242 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")

Borderland contends that Gonzalez's deposition testimony, that she worked from outside the office, should not be credited because she testified under oath, in a separate proceeding, that she did not work from home. Gonzalez brought a charge of gender discrimination against Borderland, and the Arizona Attorney General Civil Rights Division interviewed her under oath on September 11, 2020. (Doc. 43, Ex. 12 at 1-2.) In that proceeding, Gonzalez stated multiple times that, while employed by Borderland, she did not work from home. (*Id.* at 3, 7.) Borderland relies on a Ninth Circuit case holding that a litigant may not create a genuine issue of fact by offering testimony that contradicts his deposition. *See Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975) (allowing district court to credit a plaintiff's deposition testimony over a later-filed affidavit). This rule applies only if the Court finds the later-offered evidence was actually

"sham" testimony presented to defeat summary judgment by creating an issue of fact. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991).

The Court finds Gonzalez did not offer sham testimony about performing work while outside the office. The two sets of testimony do not appear to be in direct contradiction. In the September 2020 interview, Gonzalez testified that she asked for official permission to work from home full-time, which was denied. (Doc. 43, Ex. 12 at 7.) Within the same interview, Gonzalez testified to conducting work by phone while outside the office. (*Id.* at 3, 4, 6.) Thus, it appears that Gonzalez did not interpret responding to phone calls while outside the office, including from her house, as "working from home." She similarly testified that project managers did not work from home but conducted work calls at all hours of the day and night. (*Id.* at 7.)

During her deposition, Gonzalez testified that she performed work away from the office, including at home in the evenings. This testimony was consistent with her September 2020 interview that she responded to work phone calls from outside the office. Additionally, her statements that she did not "work from home," were consistent with the declarations from Borderland employees that Gonzalez was denied the right to work from home full-time. To the extent Gonzalez's deposition testimony contradicted her earlier interview statements, Borderland could have challenged her on that issue during her deposition but chose not to do so. This is not a situation in which Gonzalez submitted an affidavit, not subject to cross-examination, in order to defeat summary judgment. Therefore, the Court will not disregard her deposition testimony that she performed work while outside the office, including from home. Even if the Court were to disregard Gonzalez's testimony that she worked overtime outside the office, she also testified that she worked overtime hours from within the office. Therefore, this issue would not be sufficient to warrant summary judgment in Borderland's favor.

**Did Defendant Have Knowledge that Plaintiff Worked Overtime Hours?**

Borderland contends that it is not obligated to compensate Gonzalez for any overtime because it did not know or have reason to know that she was performing more

than 40 hours of work in a week. "[W]here an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation." *Forrester v. Roth's I. G. A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981). In other words, if an employee prevents an employer from learning of her overtime work, "the employer cannot be said to have suffered or permitted the employee to work in violation" of the FLSA. *Id.* at 414-15. However, "an employer who knows or should have known that an employee is or was working overtime must comply with the provisions of [the FLSA] . . . even if the employee does not make a claim for the overtime compensation." *Id.* at 414.

Here, several of Borderland's employees averred that they had instructed Gonzalez to work only her scheduled hours, not to work more than 40 hours per week, and not to work from outside the office. These same employees attested that they did not know that Gonzalez worked outside her scheduled hours or outside the office. There is, at most, scant evidence that Gonzalez affirmatively reported to anyone at Borderland that she was working after her scheduled work hours, that she had accrued "overtime" hours, or was not being paid for all of the hours she worked. By way of explanation, Gonzalez testified that she understood herself to be a "salaried" employee, she did not know she should report time worked over 40 hours per week, and she did not believe she qualified for overtime pay. There is no evidence Gonzalez was directed to report all hours that she worked, even if over 40 hours in a week. Borderland classified the dispatcher position as hourly, but it paid Gonzalez for working 40 hours per week every single full week of her employment, regardless of hours worked. Presumably for that reason, Borderland employees pressed Gonzalez to ensure she worked a full 40 hours every week. These requirements by Borderland support Gonzalez's erroneous interpretation that she was a salaried employee.

On a number of occasions, Gonzalez indirectly alerted her in-office colleagues and her supervisor that she was performing work outside her scheduled hours and outside the office. In March 2020, Salica and Elder acknowledged that Gonzalez alerted them by text

message about some work phone calls she had received after hours. They averred this was the first they learned of Gonzalez conducting work on her cell phone after her scheduled hours. There is other record evidence, however, suggesting they had notice earlier than that. Gonzalez mentioned to Elder that she needed to handle some scheduling matters on a day she had taken paid leave. More than once she discussed with Elder work that she had handled, and the circumstances would have alerted him that she had done so after leaving the office for the day. Salica acknowledged that Gonzales had informed her, in Summer 2019, that she received calls and text messages, on her cell phone, up until 4 p.m. At times, Gonzalez had called Elder, Salica, and the receptionist, after her scheduled work hours, to confirm certain work matters with them. Additionally, Gonzales recalled telling Salica and Elder, in an email, that she took work phone calls while out at a personal appointment. (Doc. 43, Ex. 4 at 44.) Gonzales also notified Elder and Salica that she worked through lunch one or more times due to the amount of work she needed to complete. And Gonzalez testified that she had stayed at the office as late as 5 p.m., although she was scheduled to end her workday between 2 and 3 p.m. She indicated this often was due to a late request from another Borderland employee for a task to be finished that day. Any time Gonzalez was in her office, during or after her regularly-scheduled hours, other employees could see her through her office window. Finally, Gonzalez testified that she received calls regularly after her scheduled work hours, or during personal appointments, and many of those calls were from Borderland employees. In its motion, Borderland did not argue, or establish, that it is not legally accountable for the knowledge of these employees.

There is evidence in the record that contradicts some of Gonzalez's testimony. For example, Elder and Coleman declared that they did not see Gonzalez in the office at the later times in the day to which she testified working. Also, Elder and others could have thought that Gonzalez was making up missed time when she worked past her regularly scheduled time. And it is undisputed that Gonzalez had been told not to work outside her scheduled hours.

- 12 -

1    Based on the entirety of the evidence before the Court, Borderland has not

2  established that Gonzalez prevented the company from learning that she worked overtime

3  hours. Gonzalez did not report overtime hours through an official path, but her actions

4  should have alerted her supervisor and colleagues that she was performing some amount

5  of work outside the office and after hours. Interpreting the facts in Plaintiffs' favor,

6  Borderland had reason to believe Gonzalez performed uncompensated work. *See* 29 C.F.R.

7  § 785.11 ("Work not requested but suffered or permitted is work time. . . . The employer

8  knows or has reason to believe that he is continuing to work and the time is working time.");

9  29 C.F.R. § 785.12 (Even if conducted away from the office, "[i]f the employer knows or

10  has reason to believe that the work is being performed, he must count the time as hours

11  worked.") At a minimum, there is a genuine question of fact regarding whether Borderland

12  had reason to know Gonzalez performed uncompensated overtime work.

13              **The extent of overtime as a matter of just and reasonable inference.**

14    Borderland argues that Gonzalez is unable to establish the amount and extent of

15  hours she worked beyond 40 in a given week. The parties agree that Gonzalez can satisfy

16  this burden if she produces evidence of those overtime hours "as a matter of just and

17  reasonable inference." *Mt. Clemens Pottery*, 328 U.S. at 687-88. Gonzalez estimated,

18  during her deposition, that she worked about eight hours per week beyond the 40 hours she

19  was scheduled to work, during each week that she did not take paid leave.[5] (Doc. 44-1 at

20  84.) Her calculation was based on spending at least one hour a day taking calls, text

21  messages, and orders, during lunch hour, or after hours in or out of the office. (*Id.* at 84,

22  90-91.) Gonzalez estimated that she received five or more after-hours calls a week on her

23  personal cell phone from Borderland supervisors and project managers, and it took 10 to

24  30 minutes to respond to each call. (*Id.* at 27, 32, 65-68.)

25  _____

26  [5] Borderland cites Gonzalez's testimony – that the time she spent on phone calls after hours was for the caller's convenience – to suggest the time was merely *de minimis*. Employees

27  typically cannot recover for *de minimis* overtime. *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984). Although a period of 10 minutes would generally be found *de minimis*, courts consider the aggregate period of time asserted by the employee. *Id.* at 1062-

28  63. In total, Gonzalez testified that she worked 5 to 8 hours of overtime per week, which is not *de minimis*.

1    The Ninth Circuit has not set a high bar regarding the amount of evidence an
2   employee needs to reach a jury regarding the extent of overtime hours worked. The burden
3   on the employee is not to function as an "impossible hurdle." *Brock*, 790 F.2d. at 1448
4   (quoting *Mt. Clemens Pottery*, 328 U.S. at 687). In one case, the Ninth Circuit found it
5   sufficient that "four employees testified that they had worked over 40 hours a week without
6   overtime pay." *Id.* at 1447. The court held that the testimony was not too speculative; absent
7   accurate timekeeping by the employer, "it is the duty of the trier of facts to draw whatever
8   reasonable inferences can be drawn from the employees' evidence . . . ." *Id.* at 1447-48
9   (quoting *Mt. Clemens Pottery*, 328 U.S. at 693). In another case, the court found the
10   evidence should have gone to the jury because the employee testified that she worked
11   overtime at least 10 times, but likely more than 20, during her 30-minute lunch break or
12   for 30 minutes beyond her scheduled time. *Manuel v. Quest Diagnostics, Inc.*, 341 F. App'x
13   348, 349 (9th Cir. 2009) (finding employee is not required to "prove the precise extent of
14   uncompensated work") (quoting *McLaughlin v. Seto*, 850 F.2d 586, 589 (9th Cir. 1988)).

15    This Court found a genuine issue of material fact regarding whether Gonzalez
16   worked overtime hours. If Gonzalez succeeds at trial in proving that she worked
17   uncompensated overtime, "the fact of damage is certain"; therefore, damages may be
18   awarded even if they are only approximate. *Brock*, 790 F.2d at 1448 (quoting *Mt. Clemens
19   Pottery*, 328 U.S. at 688). Borderland contends that Gonzalez is unable to distinguish
20   between working outside her normally scheduled hours to "make up" time versus working
21   overtime. Gonzalez testified that there were times she worked beyond her scheduled hours
22   due to her volume of work not just to make up for time she had been absent. Additionally,
23   she did not initiate the phone calls that prompted her to spend time responding while
24   outside the office; therefore, she could not have relied upon that time to reach the 40 hours
25   she needed in a week for her regular pay. Although Gonzalez's testimony may not be
26   precise, there remains a genuine issue of material fact regarding how many overtime hours,
27   if any, Gonzalez can establish by a just and reasonable inference.
28

## CONCLUSION

The Court finds a genuine issue of material fact prevents the granting of summary judgment in Defendant's favor. There remains an issue of fact as to whether Gonzalez worked uncompensated overtime, whether Borderland knew or should have known that she worked uncompensated overtime, and the extent of overtime, if any, Gonzalez worked.

Based on the foregoing, the Court denies the Defendant's Motion for Summary Judgment (Doc. 42). The Court finds the case is ready for trial.

**Accordingly,**

**IT IS ORDERED** that the Motion for Summary Judgment (Doc. 42) is DENIED.

**IT IS FURTHR ORDERED** that within 30 days of the filing date of this Order, the parties shall file the Joint Pretrial Order. Thereafter, a pretrial conference shall be set whereat a trial date will be set.

**IT IS FURTHER ORDERED** that in the event the parties want to attempt to settle the case, they may contact the Court's law clerk, Greer Barkley, by emailing her at: bury_chambers@azd.uscourts.gov. She will assist them is setting a settlement conference before a Magistrate Judge to serve as a settlement judge in the matter.

Dated this 15th day of September, 2022.

Honorable David C. Bury
United States District Judge

- 15 -